J-A03022-17

2017 PA Super 56

| | | |
|---|---|---|
| K.W. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| S.L. & M.L. | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| G.G. | : | No. 1372 MDA 2016 |

Appeal from the Order Entered August 8, 2016
in the Court of Common Pleas of York County
Civil Division at No: 2015-FC-002204-03

BEFORE: LAZARUS, STABILE, and DUBOW, JJ.

OPINION BY STABILE, J.:  **FILED MARCH 06, 2017**

K.W. ("Father") appeals from the order entered August 8, 2016, in the Court of Common Pleas of York County, which denied his preliminary objections and granted S.L. and M.L. ("Appellees") *in loco parentis* standing to pursue custody of Father's minor daughter, M.L. ("Child"). After careful review, we vacate and remand for further proceedings consistent with this opinion.[1]

---

[1] In his brief, Father indicates that he also is challenging the interim custody order entered November 17, 2015, in Centre County. Father's brief at 13, 16. Assuming that we have jurisdiction to address the November 17, 2015 order, our review of the record reveals that it is no longer in effect, as it was replaced by an interim custody order entered April 12, 2016. Thus, any challenge to that order is now moot.

Child was born in August 2015 to Father and G.G. ("Mother"). Father and Mother dated briefly from October 2014 until approximately December 12, 2014. N.T., 8/1/16, at 7. While the details are not entirely clear from the record, it appears that Mother discovered that she was pregnant with Child shortly after her separation from Father. *Id.* at 38. However, Mother did not directly inform Father of her pregnancy. *Id.* at 37-40. In March 2015, Mother contacted Bethany Christian Services ("BCS") in order to place Child for adoption. *Id.* at 43. BCS placed Child in the care of Appellees two days after her birth. *Id.* at 71.

Meanwhile, BCS attempted to locate Father. While Mother provided BCS Father's name, she could not initially provide any other contact information. *Id.* at 43. Mother later assisted BCS in identifying Father's Facebook profile. *Id.* at 44. BCS first attempted to contact Father on July 29, 2015, by sending him a Facebook message. *Id.* at 43. BCS also sent friend requests to Father on July 30, 2015, and August 14, 2015. *Id.* at 46. Father did not respond to the message sent by BCS, nor did he accept the friend requests.[2] *Id.* at 46-47. BCS made several other attempts at contacting Father, including calling the employer listed on Father's Facebook profile, without success. *Id.* at 48-49. Finally, with Mother's assistance,

---

[2] Father testified that BCS sent him messages, but that he did not notice them because his Facebook account treated them as "spam." N.T., 8/1/16, at 13-14. BCS employee, Jessica Crawford, could not confirm or deny whether Father actually viewed any messages. *Id.* at 46.

BCS located several of Father's last known addresses. *Id.* at 49, 64. BCS sent letters to Father on September 16, 2015. *Id.* at 64. Father received these letters on September 19, 2015, and contacted BCS to set up a meeting. *Id.* at 11-12. On approximately October 14, 2015, Father informed BCS that he did not want Child to be adopted. *Id.* at 58.

The subsequent procedural history of this matter is convoluted. On October 30, 2015, Father filed a custody complaint in Centre County, naming Mother as the only defendant.[3] Father also filed an emergency petition on November 6, 2015, in which he requested that BCS be ordered to provide him with the current whereabouts of Child, among other things. The Centre County trial court issued an order granting Father's petition that same day. On November 17, 2015, the Centre County court entered an order transferring Father's case to Lycoming County, as well as an interim custody order awarding primary physical custody of Child to Appellees, and awarding partial physical custody to Father as agreed upon by the parties.

On November 25, 2015, Appellees filed a custody complaint in York County. That same day, Appellees filed a notice of appeal from the Centre County trial court's order transferring Father's case to Lycoming County. In their concise statement of errors complained of on appeal, Appellees alleged

_____

[3] Father resides in Lycoming County, Mother resides in Northumberland County, and Appellees reside in York County. It appears that Father filed his complaint in Centre County because BCS has its place of business there.

that the Centre County court erred by failing to join them as necessary parties to the custody action, and by failing to transfer the case to York County, on the basis that York County is Child's "home county" pursuant to the Pennsylvania Rules of Civil Procedure. By order entered December 17, 2015, the Centre County court rescinded its prior order transferring the case to Lycoming County, and transferred the case to York County instead. Appellees then discontinued their appeal.

On February 26, 2016, Father filed preliminary objections to Appellees' custody complaint.[4] In his preliminary objections, Father argued that Appellees do not have standing to pursue custody of Child. Specifically, Father argued that Appellees do not stand *in loco parentis* to Child, because he did not consent to Child being placed with Appellees. Appellees filed an answer to Father's preliminary objections on March 16, 2016. On March 18, 2016, the York County trial court entered an order dismissing Appellees' complaint "without prejudice to either party to refile and request another conciliation conference," on the basis that the parties' conciliation conference was continued and then not rescheduled within the time required by local practice and procedure. Order, 3/18/16, at 2. On March 21, 2016, Father filed a praecipe to schedule a new conciliation conference, which the court granted.

---

[4] Father attached a copy of a paternity test, dated January 25, 2016, confirming that he is Child's biological father.

- 4 -

On April 4, 2016, Father filed an additional custody complaint in York County.[5] The trial court entered an interim custody order on April 12, 2016, maintaining primary physical custody with Appellees, awarding Father partial physical custody during certain weekends, and awarding shared legal custody to all parties. On May 23, 2016, Father filed a praecipe to list his preliminary objections for one-judge disposition. On August 1, 2016,

_____

[5] On May 25, 2016, the trial court entered an order consolidating all three custody complaints. In its opinion, the court provided the following explanation concerning the procedural posture of this case.

> Overall, before this Court are three (3) Custody Complaints consolidated by agreement of the parties and an Order dated May 25, 2016. Father filed Preliminary Objections to the second Custody Complaint which was filed by [Appellees]. [The Honorable Andrea] Marceca Strong dismissed the second Custody Complaint filed by [Appellees] approximately thirty-nine (39) minutes after an Application for Continuance was filed by the parties for the conciliation conference relating to the second Custody Complaint. . . . [T]his Court finds that the dismissal on March 18, 2016[,] of the Custody Complaint filed by [Appellees], which had been consolidated with Father's Custody Complaint upon transfer of Father's complaint to York County, was in error and superseded by the Order signed by [York County President Judge, the Honorable Joseph C.] Adams on March 21, 2016[,] which rescheduled the conciliation conference relating to [Appellees'] and Father's Custody Complaints. Subsequent to the third Custody Complaint being filed by Father on April 4, 2016, this matter was assigned to the undersigned Judge[,] [the Honorable Todd R. Platts]. This Court conducted a pre-trial conference with the parties at which time counsel for all three parties agreed that the three (3) custody actions should be consolidated under one caption with Father as the moving party and that Father's Preliminary Objections were still pending as to whether or not [Appellees] had standing in the matter.

Trial Court Opinion, 8/8/16, at 5-6.

Appellees filed a motion to strike Father's praecipe for one-judge disposition, or, in the alternative, preliminary objections to Father's preliminary objections.

The trial court held a hearing to address Father's preliminary objections on August 1, 2016. Following the hearing, on August 8, 2016, the court issued an order and opinion denying Father's preliminary objections, and granting Appellees *in loco parentis* standing.[6] Father timely filed a notice of appeal on August 19, 2016, along with a concise statement of errors complained of on appeal. On September 2, 2016, the court issued a supplemental opinion, in which it indicated that the reasons for its decision could be found in the opinion accompanying the August 8, 2016 order, and that no additional explanation would be necessary.

Before reaching the merits of Father's appeal, we must first consider whether the August 8, 2016 order was properly appealable. "'[S]ince we lack jurisdiction over an unappealable order it is incumbent on us to determine, *sua sponte* when necessary, whether the appeal is taken from an appealable order.'" ***Gunn v. Automobile Ins. Co. of Hartford, Connecticut***, 971 A.2d 505, 508 (Pa. Super. 2009) (quoting ***Kulp v. Hrivnak***, 765 A.2d 796, 798 (Pa. Super. 2000)). It is well-settled that, "[a]n appeal lies only from a final order, unless permitted by rule or

_____

[6] The order also denied the motion to strike and preliminary objections filed by Appellees.

statute." ***Stewart v. Foxworth***, 65 A.3d 468, 471 (Pa. Super. 2013). Generally, a final order is one that disposes of all claims and all parties. ***See*** Pa.R.A.P. 341(b).

Father concedes that the August 8, 2016 order is not a final order pursuant to Pa.R.A.P. 341(b). Father's Brief at 21. Instead, Father insists that the order is appealable pursuant to the collateral order doctrine. ***See*** Pa.R.A.P. 313(a) (providing that an appeal may be taken as of right from a collateral order of a lower court). "A collateral order is an order separable from and collateral to the main cause of action where the right involved is too important to be denied review and the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost." Pa.R.A.P. 313(b).

Father argues that the August 8, 2016 order meets the requirements of the collateral order doctrine because it "is collateral to the main issue of child custody and . . . because it impacts the number of parties who will participate in the action, and it cannot be delayed until a final order is issued without being lost." Father's Brief at 22. In support of this position, Father directs our attention to ***K.C. v. L.A.***, 128 A.3d 774 (Pa. 2015). ***Id.*** Father contends "there is no meaningful difference" between ***K.C.*** and this case.[7] ***Id.*** at 23.

---

[7] The trial court did not address the issue of appealability in its opinion accompanying the August 8, 2016 order, or in its supplemental opinion.

In **K.C.**, our Supreme Court held that an order denying intervention in a child custody case due to a lack of standing meets both the first and second prongs of the collateral order doctrine, as standing is an issue separable from, and collateral to, the main cause of action in a child custody case, and because the right to intervene in custody cases implicates Pennsylvania's "paramount interest in the welfare of children and, as a result, in identifying the parties who may participate in child custody proceedings[.]" **K.C.**, 128 A.3d at 779-80. We agree with Father that the reasoning employed in **K.C.** applies with equal force here.

However, we find that **K.C.** is distinguishable with respect to the third prong of the collateral order doctrine. In that case, the appellants argued that their claim would be irreparably lost pursuant to **In Re Barnes Foundation**, 871 A.2d 792 (Pa. 2005), in which our Supreme Court held that an order denying intervention must be appealed within thirty days. **Id.** at 778. Our Supreme Court agreed, reasoning that the appellants would be unable to appeal the order denying their petition to intervene if they waited until the completion of the underlying custody proceedings. **Id.** at 780. If the appellants attempted to appeal from the order denying intervention after the entry of a final custody order, their appeal would be untimely pursuant to **Barnes**. **Id.** Further, the appellants would not be permitted to appeal from the final custody order itself, as the fact that they were denied intervention meant that they were not parties to the custody action. **Id.**

Here, in contrast, Father has not been denied intervenor status. ***Barnes*** does not apply, and Father remains a party to the underlying custody action.

Nonetheless, we conclude that Father's claim will be irreparably lost if we postpone review until the entry of a final order. Standing in child custody cases is a matter of constitutional significance. As our Supreme Court has emphasized, "the right to make decisions concerning the care, custody, and control of one's children is one of the oldest fundamental rights protected by the Due Process Clause" of the Fourteenth Amendment. ***Hiller v. Fausey***, 904 A.2d 875, 885 (Pa. 2006) (citing ***Troxel v. Granville***, 530 U.S. 57, 120 S.Ct. 2054 (2000)). Mindful of this fundamental right, our law presumes that parents are fit and make decisions in their children's best interest, "absent factors such as abuse, neglect, or abandonment." ***D.P. v. G.J.P.***, 146 A.3d 204, 214 (Pa. 2016).

Allowing third parties to seek custody of a child burdens the constitutional rights of parents. ***Id.*** at 210, 213. In ***D.P.***, our Supreme Court emphasized the importance of permitting parents to challenge standing in child custody cases, in order to protect those rights. The Court reasoned as follows.

> Therefore, as illustrated presently, whenever there are contested issues relating to standing, [the Child Custody Act] gives parents the ability to bifurcate the proceedings by seeking dismissal for lack of standing, thereby requiring that any such preliminary questions be resolved before the complaint's merits are reached.
>
> The potential for such bifurcation serves an important screening function in terms of protecting parental rights. As suggested, it facilitates early dismissal of complaints, thereby relieving

families of the burden of litigating their merits where a sufficient basis for standing is absent. **Accord Rideout v. Riendeau**, 761 A.2d 291, 302–03 (Me. 2000) (plurality) (indicating that, in a bifurcated procedure, grandparent-standing requirements "provide[ ] protection against the expense, stress, and pain of litigation, unless and until the grandparents have convinced the court that they are among those grandparents who may pursue visits"). Indeed, a majority of Justices in **Troxel** recognized that such litigation can itself impinge upon parental rights, especially if it becomes protracted through the appellate process. **See Troxel**, 530 U.S. at 75, 120 S.Ct. at 2065; **id.** at 101, 120 S.Ct. at 2079 (Kennedy, J., dissenting); **accord Blixt v. Blixt**, 437 Mass. 649, 774 N.E.2d 1052, 1065–66 (2002).[15] . . . .

---

[15] **Hiller** also took notice of the costs associated with custodial litigation, indicating that grandchildren are not benefitted when "grandparents force their way into [their] lives through the courts, contrary to the decision of a fit parent," and adding that such consideration was "especially resonant given the strain that custody litigation places on the children as well as parents and grandparents[.]" **Hiller**, 588 Pa. at 359 & n.20, 904 A.2d at 886 & n.20 (citing **Troxel**, 530 U.S. at 101, 120 S.Ct. at 2079 (Kennedy, J., dissenting) (describing that custody litigation tends to be disruptive of family life and that, for a parent struggling financially, the monetary costs can undermine the parent's plans for the child's future)). Other courts have made similar observations. **See, e.g., Conlogue v. Conlogue**, 890 A.2d 691, 699 (Me. 2006) (proffering that the strains of litigation "include various forms of pressures and stress that can pose a real threat to family well-being" (internal quotation marks and citations omitted)); **Hawk v. Hawk**, 855 S.W.2d 573, 577 n.2 (Tenn. 1993) (noting that such stresses include those that arise from the public disclosure of the details of private, inter-generational disputes); **cf. id.** at 576 n.1 (suggesting that court-ordered grandparent visitation in a family where there is animosity between the parents and grandparents can intensify the animosity and, as such, can be contrary to the child's best interests).

**Id.** at 213; **see also id.** at 218 (Baer, J., concurring and dissenting) ("I agree with the majority that Subsection 5325(2) implicates parents'

fundamental right to be free from litigation regarding their children, especially in light of the nature of child custody litigation and the negative effects it can have on children.").

Thus, Father has a fundamental constitutional right to parent Child. This includes the right to be free of custody litigation involving third parties. If we quash this appeal and remand to the trial court, Father will be subjected to extensive litigation involving Appellees, including a custody hearing and a second appeal on the exact issue he now seeks to raise. Not only would Father incur a substantial financial burden as a result of this litigation, but he also could lose months of time caring for and bonding with Child as the custody hearing and appeals process drags on. Under the unique circumstances of this case, where Father was deprived of Child by a private adoption agency without the benefit of a hearing or other due process protections, this Court could not hope to fully vindicate or restore Father's rights by the time of his second appeal. We therefore conclude that the August 8, 2016 order satisfies all three prongs of the collateral order doctrine, and that Father's appeal is properly before us.

We may now turn our attention to the merits of Father's appeal. Father raises the following issues for our review.

> 1. Whether the trial court erred or abused its discretion when it overruled [Father's] preliminary objection pursuant Pa.R.C.P. No. 1028(5) averring that [Appellees] lack standing for any form of custody and its conclusion that [Appellees] stand *in loco parentis* to [Child] despite lacking consent of the natural father, [Father?]

2. Whether the trial court erred or abused its discretion when it held that [Father] involuntarily or impliedly consented to *in loco parentis* status granted [Appellees] by the trial court of Centre County and failing to recognize that the consent of either parent may be withdrawn, terminating *in loco parentis* status[?]

3. The trial court erred or abused its discretion by concluding that *in loco parentis* status can be validly conferred by judicial error.

Father's Brief at 8-9. While Father asks us to consider three separate issues, his arguments with respect to each issue are essentially the same. Father argues that the trial court erred by denying his preliminary objections and granting Appellees *in loco parentis* standing to seek custody of Child.

"Threshold issues of standing are questions of law; thus, our standard of review is *de novo* and our scope of review is plenary." **Rellick-Smith v. Rellick**, 147 A.3d 897, 901 (Pa. Super. 2016) (quoting **Johnson v. American Standard**, 8 A.3d 318, 326 (Pa. 2010)).

Generally, the Child Custody Act does not permit third parties to seek custody of a child contrary to the wishes of that child's parents. The Act provides several exceptions to this rule, which apply primarily to grandparents and great-grandparents. **See** 23 Pa.C.S.A. § 5324(3); 23 Pa.C.S.A. § 5325. In fact, unless a person seeking custody is a parent, grandparent, or great-grandparent of the child, the Act allows for standing only if that person is "*in loco parentis*." 23 Pa.C.S.A. § 5324(2).

"The term *in loco parentis* literally means 'in the place of a parent.'" **Peters v. Costello**, 891 A.2d 705, 710 (Pa. 2005) (citing Black's Law Dictionary, 791 (7th Ed. 1991)). A person stands *in loco parentis* with

respect to a child when he or she "assum[es] the obligations incident to the parental relationship without going through the formality of a legal adoption. The status of *in loco parentis* embodies two ideas; first, the assumption of a parental status, and, second, the discharge of parental duties." ***Id.*** (quoting ***T.B. v. L.R.M.***, 786 A.2d 913, 916–17 (Pa. 2001)). Critical to our discussion here, "*in loco parentis* status cannot be achieved without the consent and knowledge of, and in disregard of[,] the wishes of a parent." ***E.W. v. T.S.***, 916 A.2d 1197, 1205 (Pa. 2007) (citing ***T.B.***, ***supra***).

Instantly, the trial court found that Appellees stand *in loco parentis* with respect to Child, because they have assumed parental status and discharged parental duties on Child's behalf since shortly after her birth. Trial Court Opinion, 8/8/16, 6-8. The court reasoned that Father gave his implied consent to Appellees' *in loco parentis* standing because he did not express interest in parenting Child until almost a month after being informed that she was residing with a prospective adoptive family. ***Id.*** at 8.

Father contends that the trial court erred because he did not expressly consent to Appellees' *in loco parentis* standing, and because implied consent is not permissible under Pennsylvania law. Father relies on ***B.A. v. E.E. ex rel. C.E.***, 741 A.2d 1227 (Pa. 1999). In that case, the subject child, M., was born on January 4, 1996, to two teenage parents. ***Id.*** at 1228. The day after M.'s birth, her mother, E., gave custody of M. to Genesis of Pittsburgh, an adoption agency. ***Id.*** Genesis placed M. with prospective adoptive parents and E. signed a consent to adoption form. ***Id.*** Genesis forwarded a

similar consent to adoption form to M.'s father, A., but he refused to sign.

**Id.** Subsequently, on February 26, 1996, A. and his mother filed a complaint for primary physical custody of M. **Id.** M.'s prospective adoptive parents then filed a motion to intervene in the custody proceedings, which the trial court granted on the basis of their *in loco parentis* standing. **Id.** Following a custody hearing, the court awarded primary physical custody of M. to her prospective adoptive parents. **Id.** Father appealed the court's determination and this Court affirmed. **Id.** Our Supreme Court then reversed this Court, vacated the order granting primary physical custody to M.'s prospective adoptive parents, and remanded the matter for a new custody hearing. **Id.** at 1229. The Court reasoned as follows.

> Normally, a third party may challenge custody only through dependency proceedings. The Juvenile Act, which governs dependency proceedings, defines a dependent child, *inter alia*, as "A child who is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental or emotional health, or morals." 42 Pa.C.S. § 6302. In other words, in order for a third party to interfere in a natural parent's custody of his child, the third party would have to show in a dependency proceeding that the child is not properly cared for. If the third party were able to prevail on that issue, then the third party could intervene in a custody proceeding. As Superior Court stated in **Cardamone v. Elshoff**, 442 Pa.Super. 263, 659 A.2d 575 (1995): "[U]nless the natural parents' prima facie right to custody is successfully overcome via the dependency proceedings, this court cannot confer standing upon third parties to interfere with the parent child relationship." 659 A.2d at 581.
>
> An exception to this rule is that where the third parties stand *in loco parentis*, i.e., where the third parties "assumed obligations incident to the parental relationship," **id.**, the third party may intervene in a custody proceeding. However, "a third party cannot place himself *in loco parentis* in defiance of the

- 14 -

parents' wishes and the parent/child relationship." ***Gradwell v. Strausser***, 416 Pa.Super. 118, 610 A.2d 999, 1003 (1992).

> The record in this case establishes that A attempted to gain custody of his child from shortly after the child was born until the present. He opposes the adoption and he seeks custody of the child himself. It is plain that [the prospective adoptive parents] retain custody of his child in defiance of his wishes. The lower courts were in error, therefore, in conferring standing upon the prospective adoptive parents.

***Id.*** at 1228-29 (footnote omitted).

Appellees attempt to distinguish ***B.A.*** by citing ***In re C.M.S.***, 884 A.2d 1284 (Pa. Super. 2005), *appeal denied*, 897 A.2d 1183 (Pa. 2006). In that case, the father, D.E.H., Jr., visited C.M.S. in the hospital on one occasion shortly after her birth, but otherwise made no effort to be involved in her life. ***Id.*** at 1285. Meanwhile, C.M.S.'s mother arranged for her adoption without D.E.H., Jr.'s, consent. ***Id.*** About a year later, C.M.S.'s prospective adoptive parents filed a petition to involuntary terminate D.E.H., Jr.'s, parental rights, which the trial court denied. ***Id.*** at 1285. The prospective adoptive parents appealed, and this Court reversed, concluding that the trial court abused its discretion by failing to terminate D.E.H., Jr.'s, parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (6). ***Id.*** We then remanded the case for consideration of 23 Pa.C.S.A. § 2511(b). ***Id.*** at 1286. After remand, the court terminated D.E.H., Jr.'s, parental rights, and he appealed. ***Id.*** D.E.H., Jr., challenged the prospective adoptive parents' *in loco parentis* standing on the basis that he did not consent to their adoption of C.M.S. ***Id.*** at 1288-89. This Court concluded that D.E.H., Jr.,

could no longer challenge standing, because we "implicitly determined" that the prospective adoptive parents had standing during the first appeal, and the prospective adoptive parents' standing was now the law of the case.[8] *Id.* at 1288. In the alternative, this Court concluded that C.M.S.'s prospective adoptive parents had proper *in loco parentis* standing, because they assumed and discharged parental duties on behalf of C.M.S. for a year while D.E.H., Jr., did nothing. *Id.* at 1289-90. We explained that denying *in loco parentis* standing to the prospective adoptive parents "would require us to ignore not only the reality of this child's life, but also [D.E.H., Jr.'s,] failure to establish any sort of bond with his newborn child or to provide in any way for her care."[9] *Id.* at 1289.

---

[8] This rationale was later called into question in *In re Adoption of Z.S.H.G.*, 34 A.3d 1283, 1288 n.4 (Pa. Super. 2011), *reargument denied* (Feb. 21, 2012).

[9] We relied on *McDonel v. Sohn*, 762 A.2d 1101 (Pa. Super. 2000), *appeal denied*, 782 A.2d 547 (Pa. 2001). In *McDonel*, the appellant, Spangler, denied paternity and made little effort to be involved in the life of his daughter, C.S., for three and a half years. *Id.* at 1103. During that time, C.S. and her mother, Sohn, stayed frequently with C.S.'s aunt and uncle, the McDonels. *Id.* Sohn also executed a power of attorney, granting "*in loco parentis* powers" to the McDonels. *Id.* at 1105. Spangler eventually filed for partial physical custody of C.S., and visited with her one weekend per month. *Id.* at 1103. About a year and half later, Sohn committed suicide. *Id.* While Sohn was in the hospital on life support, the McDonels filed for custody. *Id.* At the conclusion of the custody proceedings, the trial court awarded primary physical custody and shared legal custody of C.S. to the McDonels. *Id.* at 1104. Spangler argued on appeal that the McDonels lacked *in loco parentis* standing, because he did not consent to their role in C.S.'s life. *Id.* at 1106. This Court rejected Spangler's argument, reasoning
*(Footnote Continued Next Page)*

After review, we agree with Father that the facts of *B.A.* are essentially identical to the facts of this case, and we see no reasonable basis upon which to distinguish them. While the trial court concluded that Father gave his implied consent to Appellees' *in loco parentis* standing, our research does not reveal that this Court, or our Supreme Court, has held that consent to *in loco parentis* standing can be implied. In *C.M.S.*, this Court explained that D.E.H., Jr., demonstrated his consent by failing to be involved in C.M.S.'s life for a year. D.E.H., Jr.'s, consent was not implied; he acted in a manner consistent with consent. In contrast, the father in *B.A.*, A., acted in a manner inconsistent with consent by filing for custody of M. less than two months after her birth. Here, Father also acted in a manner inconsistent with consent, by promptly informing BCS that he did not want Child to be adopted less than a month after being notified that she was residing with prospective adoptive parents, and by filing a custody complaint shortly thereafter. We therefore conclude that Father did not consent to Appellees attaining *in loco parentis* status with respect to Child, and that the trial court erred by denying Father's preliminary objections.

*(Footnote Continued)* ───────────────

that a parent cannot claim that a party is acting in *loco parentis* in defiance of his or her wishes unless that parent's actions "necessarily would conflict with a finding that a third party achieved in *loco parentis* status. Here, Spangler initially denied paternity, had little contact with C.S., and no contact with the McDonels and so could not have been an obstruction to the McDonels' developing relationship with C.S." *Id.* (footnote omitted).

In reaching this conclusion, we stress once again that Father has a fundamental constitutional right to care for Child, and that he is presumed to be a fit parent. *Hiller*, 904 A.2d at 885; *D.P.*, 146 A.3d at 214. If a parent is unfit, this Commonwealth has a well-established system for adjudicating children dependent, terminating parental rights, and placing children in pre-adoptive homes. However, these remedies are available only if a parent is provided essential due process protections, including notice, a hearing, and proof by clear and convincing evidence. Here, we note with disapproval, Father has been deprived of Child without any evidence in the record that he is an unfit parent, and without the benefit of due process protections.

BCS's decision to place Child for adoption without Father's consent is particularly troubling. Mother first contacted BCS in March 2015. BCS then made no effort at all to contact Father for approximately four months, until July 29, 2015. By the time BCS sent letters to Father on September 16, 2015, Child was already residing with Appellees. Because of BCS's inaction, Father has now spent well over a year fighting for custody of Child. In addition, Appellees have spent over a year and a half hoping to adopt Child, only to have their hopes dashed by this decision. While we are sympathetic to Appellees, who have no doubt expended immense time and effort caring for Child and ensuring her well-being during this difficult process, our sympathies must give way to Father's fundamental constitutional rights.

Based on the foregoing, we conclude that the trial court erred by denying Father's preliminary objections and granting Appellees *in loco*

*parentis* standing on an implied basis with respect to Child. We therefore vacate the August 8, 2016 order, and we remand this matter to the court to enter an order granting Father's preliminary objections, and to conduct further custody proceedings consistent with this opinion. [10]

Order vacated. Case remanded for further proceedings consistent with this Opinion. Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/6/2017

---

[10] The remaining parties in this matter are Father and Mother. Mother did not file a separate brief in connection with this appeal, but joined the brief filed by Appellees. It is not clear what her position is in terms of sharing custody of Child with Father. When addressing custody on remand, the trial court should be sure to consider Mother's rights.